# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Ronald Henderickson, | : | |
| Petitioner, | : | |
| v. | : | Case No. 2:10-cv-1084 |
| | : | JUDGE JAMES L. GRAHAM |
| Warden Lebanon Correctional Institution, | : | Magistrate Judge Kemp |
| | : | |
| Respondent. | : | |

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254.  This matter is before the Court on that petition, respondent's return of writ, and petitioner's reply.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that petitioner's claims be **DISMISSED**.

## FACTS AND PROCEDURAL HISTORY

{¶ 7} During the early morning hours Hendrickson fatally stabbed his ex-girlfriend, Jodi Blankenship, in a house they shared with three other Hocking College students. The evidence showed that during their two and a half year relationship, they frequently argued and would often break up. After their final break up in February 2007, Hendrickson was upset and very depressed. Then in March, Blankenship began dating Dale Wible.

{¶ 8} On evening in April, Hendrickson and Blankenship got into an argument over Wible's plans to visit her that weekend. Brian Mannazzi, one of the roommates, testified that Hendrickson went upstairs to Blankenship's room and they began arguing. He testified that at some point after 11:30 p.m., they were still arguing and Blankenship locked herself in a downstairs bathroom, which she commonly did when they were "arguing severely." Mannazzi stated that he saw Hendrickson outside the bathroom as they continued to argue and later heard

Hendrickson walk outside to the breaker box and cut off the power to some parts of the house. Mannazzi testified that the second time he saw Hendrickson outside the bathroom it "scared" him because Hendrickson was "crouched" in the corner with the lights off. He testified that Hendrickson may have had something in his hands. He stated that he returned to bed and was just falling asleep when he heard the bathroom door open. He testified that he heard Blankenship say "Ron" in a "surprised voice" and then heard her scream for about 30 seconds; he then heard Hendrickson yell "Jodi you stabbed me."

{¶ 9} Corey Suydam, another roommate, testified that he saw Hendrickson sitting in the corner outside the bathroom that night with the lights off, just "staring ahead." Suydam testified that he later awoke to the sound of a woman screaming. When he went to the area outside the bathroom, he saw Blankenship on the ground covered with blood and Hendrickson standing over her. Hendrickson kept saying "she stabbed me, she stabbed me" and showed Suydam where he had been stabbed. Suydam called 911.

{¶ 10} Dale Wible testified that he was on the phone with Blankenship when Hendrickson came to her room that evening and could hear Hendrickson yelling in the background. Hendrickson began ridiculing and making threatening statements to Wible, telling Blankenship that if Wible spent the night that weekend, "bad shit is going to happen." Hendrickson also said that he had "ranger training" and would use it against Wible. Blankenship told Wible that Hendrickson would not leave her room. When asked why he did not call the police, Wible explained that she had begged him not to because during a previous incident, the police were called and made her leave the house for the weekend. He testified that at some point after 11:30 p.m., Blankenship left her room and locked herself in the downstairs bathroom. While she was in the bathroom, they exchanged several text messages between 12:00 a.m. and 12:15 a.m. and then had a 30 minute telephone conversation between 12:15 a.m. and 12:45 a.m. Wible testified that he could hear the door rattling as Hendrickson tried to enter the bathroom. Suydam's 911 call occurred at 12:49 a.m.

{¶ 11} Several responding officers and emergency personnel testified concerning their observations upon arriving at the scene. Officer Shawn Champ with the Nelsonville Police Department, the first responding officer, testified that as he walked up to the house Hendrickson, who was bleeding from his side, approached him and stated, "I stabbed her, I

stabbed her." Because Hendrickson did not appear to be seriously injured and Officer Keith Tabler had just arrived, Officer Champ went inside the house to check on the other victim. He discovered Blankenship's lifeless body on the floor and found a knife next to her body. Officer Table, also with the Nelsonville Police Department, testified that when he arrived at the scene, he observed Hendrickson holding his side, rocking back and forth, and mumbling. He asked Hendrickson what happened and Hendrickson responded, "I think I killed her." Officer Brian Sass with the Hocking College Police Department testified that Hendrickson also made statements to him at the scene concerning what happened; Hendrickson stated, "She stabbed me and I took the knife and I stabbed her and stabbed her and stabbed her and stabbed her." Timothy Rodehaver, a paramedic with the Southeast Ohio EMS, testified that when he arrived Hendrickson was sitting outside. He testified that while assessing Hendrickson's injuries, Hendrickson told him that "he had been stabbed and in self-defense he had stabbed her." Rodehaver testified that Hendrickson had a small stab wound on his left side and another small wound underneath the stab wound.

{¶ 12} Jonathan Jenkins, a crime scene investigator with the Ohio Bureau of Criminal Identification and Investigation, testified that he "processed" the scene. He described the knife found near Blankenship's body as a pocket knife; a folding blade with a partial serrated blade and smooth blade with a clip on it. He also testified that the locking mechanism on the bathroom door was bent, that there was a crack in the door jam, and that paint chips had fallen off the door frame onto the floor. He recovered several writings from Hendrickson's room, including notes, poems, and Biblical verses Hendrickson had previous given to Blankenship. Finally, he found several knives in the trunk of Hendrickson's car.

{¶ 13} Dr. Manesha Pandey, who performed the autopsy on Blankenship's body, testified that the cause of death was "multiple sharp force trauma." According to her testimony, Blankenship suffered 14 stab wounds, six of which were fatal. Her neck was slashed and her right thyroid artery and right thyroid cartilage were sliced in two. She also suffered from a fractured cervical vertebrae. She also sustained stab wounds to her heart, lungs, abdomen, hips, and shoulder and several "defensive wounds" to her arms and hands.

{¶ 14} The State also presented testimony from friends and family

3

members of Blankenship. None of them ever knew Blankenship to carry a knife.

{¶ 15} Then the defense presented its case. Hendrickson, who was a park ranger student, testified that during his relationship with Blankenship, he was "verbally cruel" toward her, but denied ever hitting her. He testified that during the weeks following their final break up, he was "very depressed" and gave Blankenship several writings including poems, notes, and Biblical scriptures expressing his despair. While he testified that he was moving on with his life, he admitted that he was "concerned" about Wible's upcoming visit that weekend. Hendrickson testified that when he arrived home on the evening of April 11th, he discovered some writings that he had previously given to Blankenship under his bedroom door. He tried to call her a couple of times, but she did not answer her cell phone. So, he went upstairs to her room. According to Hendrickson, he attempted to engage in a causal conversation with her, but she was on the phone with Wible. He testified that when she got off the phone, he tried to talk to her about the plans for the weekend. Hendrickson testified that at some point, she began talking to Wible again and stated "he won't" several times; she then grabbed him by the arm and started pulling him off of her bed and said "he won't leave." Hendrickson testified that as he walked toward the door, she held the phone up so that he could hear what they were saying. Hendrickson testified that he became upset and started yelling at them. He testified that Blankenship then took items from her purse, walked downstairs, and locked herself in the bathroom.

{¶ 16} Hendrickson testified that he followed her downstairs, "shook" the door to see if it was locked, and "persisted in yelling." He then went outside and turned off the breaker switches to the lights in an effort to get her to come out of the bathroom. He then sat down on the floor outside the bathroom for a "long time." At some point, when he heard the door to their bathroom open, he stood up and saw Blankenship standing in the bathroom doorway using her cell phone as a light.

{¶ 17} Hendrickson testified that she then said, "I have a knife." According to Hendrickson, he "laughed" and raised his arm to lean against the door jam, partially blocking her exit. He testified that he then felt a sharp pain on his left side and that it "shocked" him. He testified that he then "made contact" with Blankenship and "started pushing away." He testified that he was "very scared" and thought he was going to die, that he was "fearful" for his life, and that he was "just panicking" and "in passion."

He testified that he twice yelled "what's the knife for" in an effort to get help and started pushing with both hands. He testified that he believed he may have gotten a hold of the knife, but he was not sure. He testified that she was "trying to resist me" and that she then said, "oh my gosh Ron" which "startled" him. He stated that he stopped pushing, but that she then came back toward him and pushed him backward. Hendrickson stated that he was "panicking" and thought he was a "dead man." The next thing he remembered was pushing and pulling, from side to side, and back and forth, "trying to stop me from getting stabbed and stuff." When asked why he fought with Blankenship, Hendrickson stated, "To save myself. I didn't want to die. To stop myself from getting stabbed." At trial, Hendrickson identified the knife used in the stabbing and testified that he had given it to Blankenship as a gift in 2005 and that she carried it in her purse. He also testified that he did not receive stitches for the two stab wounds he sustained.

{¶ 18} Other witnesses also testified on Hendrickson's behalf. Shalon Chrislit and Brittany Franks generally testified about Hendrickson's activities that night before he returned home. Chrislit testified that Hendrickson was in a "great mood" that night and that he had made plans with another woman, Caitlin Williams, to go out that weekend. Hendrickson's mother, Penny Hendrickson, also testified. She testified that in 2006 she had a conversation with Blankenship and her mother during which they joked about the "strange" gift Hendrickson had given Blankenship; she testified that Hendrickson had given Blankenship a knife as a gift in 2005. His father, Ronald Hendrickson Sr., also testified. He testified that the weekend following the stabbing as he was cleaning out Hendrickson's room, he discovered the pants Hendrickson had been wearing before he went to Blankenship's room that night. He testified that when he picked them up, a Leatherman knife fell out of them. The defense argued that had Hendrickson intended to stab Blankenship, he would have likely used this knife.

{¶ 19} Hendrickson requested jury instructions on self-defense and voluntary manslaughter. The trial court denied his requests, and the jury found him guilty of aggravated murder. The court later sentenced Hendrickson to life in prison, with parole eligibility after 30 years.

*State v. Hendrickson*, 2009 WL 2682158 (Ohio App. 4th Dist. August 24, 2009); *Exhibit 9 to*

*Return of Writ*

Represented by new counsel, petitioner filed a notice of appeal on May 30, 2008.

*Exhibit 5 to Return of Writ.*  He raised the following assignments of error on appeal:

> 1.  THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND DENIED APPELLANT HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO A TRIAL BY JURY AND DUE PROCESS WHEN IT REFUSED TO INSTRUCT ON THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE.
>
> 2.  THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND VIOLATED THE DUE PROCESS CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS WHEN IT REFUSED APPELLANT'S REQUEST TO INSTRUCT ON THE INFERIOR OFFENSE OF VOLUNTARY MANSLAUGHTER.
>
> 3.  TRIAL COUNSEL WAS INEFFECTIVE UNDER THE SIXTH AMENDMENT OF THE U.S. CONSTITUTION FOR FAILING TO PROPERLY ADVISE HIS CLIENT ABOUT THE POSSIBLE MAXIMUM TERM HE WAS FACING.

*Exhibit 6 to Return of Writ.*

On August 24, 2009, the appellate court affirmed the judgment of the trial court.

*Exhibit 9 to Return of Writ.*  Petitioner, through appellate counsel, filed a timely notice of appeal to the Ohio Supreme Court setting forth the following propositions of law:

> I.  A defendant is entitled to an instruction, including an affirmative defense, if they can illustrate sufficient evident (sic), which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.
>
> II.  Introduction of evidence of self-defense does not preclude an instruction for voluntary manslaughter, on a "heat of passion" or "fit of rage" theory if there is evidence sufficient to support defendant's conviction for voluntary manslaughter.
>
> III.  Counsel's failure to be aware of, and advise a defendant of the possible sentences upon conviction, which induce a defendant to stand

6

trial, constitutes ineffective assistance of counsel.

*Exhibit 11 to Return of Writ.*  The Ohio Supreme Court denied leave to appeal and

dismissed petitioner's case as not involving any substantial constitutional question.

*Exhibit 13 to Return of Writ.*

On December 3, 2010, petitioner, proceeding through counsel, filed the instant

petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in

the custody of the respondent in violation of the Constitution of the United States based

upon the following grounds raised on the face of the petition, and set forth as follows:

> 1.  The Petitioner was not afforded his Sixth Amendment right to assistance of counsel.

> 2.  Petitioner was deprived his right to present a complete defense due to the trial court's denial of a self-defense instruction.

It is the position of respondent that petitioner's claims fail on their merits.

## STANDARD OF REVIEW

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L.

104-132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v.*

*Johnson*, 532 U.S. 782, 791, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Wilson v. Parker*, 515 F.3d

682, 691 (6th Cir.2008).  AEDPA imposes a "highly deferential standard for evaluating

state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d

481 (1997), and "demands that state-court decisions be given the benefit of the doubt,"

*Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam ).

*Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)(footnote omitted) .

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented.  28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As the Supreme Court has explained, "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005).  Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." *Id.*, at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836

(2007). The Court will apply this standard to petitioner's claims.

## CLAIM ONE

Petitioner's first claim is that his Sixth Amendment right to counsel was violated when he proceeded to trial based on erroneous information provided by his trial counsel. According to petitioner, his trial counsel led him to believe that the maximum penalty he was facing if he went to trial was twenty years to life imprisonment. Petitioner asserts that he could have accepted a plea deal that would have resulted in a prison term of fifteen years. He claims that he did not pursue this deal because he believed that his maximum sentence was twenty years to life. Instead, he received a sentence of thirty years to life. When petitioner raised this issue on direct appeal, the state appellate court addressed the issue this way:

### IV. Ineffective Assistance

{¶ 47} In order to prevail on a claim of ineffective assistance of counsel, Hendrickson must show (1) his counsel's performance was deficient in that it fell below an objective standard of reasonable representation, and (2) the deficient performance prejudiced his defense so as to deprive him of a fair trial. *State v. Smith* (2000), 89 Ohio St.3d 323, 327, 731 N.E.2d 645, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To establish prejudice, Hendrickson must show that there exists a reasonable probability that, were it not for counsel's errors, the result of the proceeding would have been different. *State v. White* (1998), 82 Ohio St.3d 16, 23, 693 N.E.2d 772; *Bradley*, at paragraph three of the syllabus.

{¶ 48} In his third assignment of error, Hendrickson contends that his trial counsel was ineffective for failing to properly advise him about the possible maximum term he was facing if convicted after trial. Hendrickson contends that trial counsel failed to pursue a "flat" 15-year

plea deal based on counsel's erroneous belief that the maximum sentence for aggravated murder was life with possible parole after 20 years. Hendrickson argues that by advising him that he was only facing a 20-year to life sentence, and not the actual 30-year to life sentence he ultimately received, trial counsel "could have inadvertently induced" him to proceed to trial and that counsel's error should be "deemed prejudicial."

{¶ 49} Our review of the record shows that after the jury returned its verdict, the parties discussed the possible sentences with the court. During their discussion, defense counsel stated:

BY MR. HODGE: Thank you, Judge. We would submit there are no specifications in this case. It's a statutory sentence. There's only one sentence available to the Court, twenty to life.

* * *

BY THE JUDGE: Unless I'm reading the wrong grid Mr. Hodge, I think there are several options. I'm looking at 2929.03(A)(1)(a). Except as provided in (A)(2) of this section the trial court shall impose one of the following sentences. I think that's the section. Now if I'm wrong, tell me so. It says I have, one option is life in prison without parole. The second option is life imprisonment with parole eligibility after twenty years. A third is life in prison with eligibility after twenty five years. And a four [sic] is life in prison with thirty years. Is that your understanding, Mr. Warren?

{¶ 50} Thereafter, the court held a bench conference, during which the following exchange took place:

BY MR. HODGE: (Inaudible) my client in terms of (inaudible) egregious error on my part.

BY THE JUDGE: You advised him it was twenty to life?

BY MR. HODGE: Twenty to life, yes sir. I advised him of that and he turned down a flat fifteen. He turned down (inaudible) voluntary manslaughter. I'm sorry. A straight murder charge offer at a different time. (Inaudible) and that is an egregious error on my part.

10

BY MR. WARREN: Just for the record, we talked about some possibilities. We never offered a flat fifteen.

BY MR. HODGE: Well we had further discussions more recently where essentially (inaudible) from the Prosecutor was likely to be accepted. All I'm saying is he without being properly advised did not authorize me to do that. I don't know what to say here. I don't know what to say.

* * *

BY MR. HODGE: I can only apologize. It's just an egregious error on my part.

BY THE JUDGE: Do you want to speak to him?

BY MR. HODGE: There's nothing that can be done at this point.

{¶ 51} The court later sentenced Hendrickson to life imprisonment with parole eligibility after thirty years.

{¶ 52} The *Strickland* analysis applies to claims of ineffective assistance of counsel involving counsel's advice offered during the plea process. *Hill v. Lockhart* (1985), 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203. A defendant who asserts that his counsel was constitutionally ineffective for encouraging him to plead guilty must prove both that his counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*. at 59. Similarly, a defendant who claims that his counsel was ineffective for encouraging him to reject a plea bargain and go to trial states a viable Sixth Amendment claim. See *Turner v. Tennessee*, 858 F.2d 1201, 1205 (6th Cir.1988), vacated on other grounds, 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), reinstated on other grounds, 940 F.2d 1000. The defendant must prove both deficient performance on the part of his counsel and that, but for his counsel's advice, there is a reasonable probability that he would have pleaded guilty. *Id*. at 1206.

{¶ 53} Here, we assume that trial counsel was deficient in failing to properly advise Hendrickson about the possible maximum term he was facing if convicted after trial. However, Hendrickson fails to demonstrate a reasonable probability that, but for his counsel's errors, the result of the

11

proceeding would have been different. First, as the State points out, there is no evidence that the State offered a "flat" 15-year term. In fact, while the prosecutor referenced "some possibilities" that were discussed concerning the plea negotiations, there is no evidence in the record concerning the plea bargain process. Specifically, there is no evidence in the record concerning the plea offers actually made and/or rejected. Second, Hendrickson fails to demonstrate a reasonable probability that he would have accepted any particular offer, including a "flat" 15-year term, even if the State had offered it and his counsel had so advised. He fails to point to any evidence in the record to show that, but for his counsel's advice, there is a reasonable probability that he would have pleaded guilty. Hendrickson's contention that trial counsel "could have inadvertently induced" him to proceed to trial is insufficient. Because the record before us fails to support Hendrickson's claim that his trial counsel's deficient performance prejudiced him, we reject his ineffective assistance of counsel claim.FN1

FN1. A direct appeal is not the proper avenue for an attack on counsel's performance that must rely upon evidence outside the record of the trial. Post-conviction relief may be available to contest those claims, however.

For purposes of petitioner's habeas claim, it is well-established that the right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington, supra*, 466 U.S. at 687; *see also Blackburn v. Foltz*, 828 F.2d 1177

(6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 697. Because petitioner must satisfy both prongs of the Strickland test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland*, 466 U.S. at 697.

In the context of a plea bargain, *Strickland* requires that a petitioner show (1) deficient performance due to counsel's mistaken encouragement to reject a plea bargain and (2) actual prejudice: that but for counsel's mistaken advice, a reasonable probability exists that the petitioner would have accepted the plea offer.  *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir.  2001); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

 Respondent asserts that the state appellate court properly applied the *Strickland* standard in concluding that petitioner had not established that, but for his counsel's errors, the result of the proceeding would have been different.  In reply, petitioner asserts that, because his counsel stated on the record that petitioner proceeded to trial

because he thought, as a result of counsel's advice, that he faced only a potential additional five years of incarceration, he has met his burden of establishing prejudice. The Court agrees with respondent that petitioner's allegations are insufficient to establish prejudice under *Strickland*.

Much of petitioners' argument on this issue is directed to trial counsel's alleged deficiencies in failing to properly advise him of the potential maximum term if he was convicted after trial. In concluding that petitioner had not met the requirements of *Strickland*, however, the state appellate court assumed the deficiency of trial counsel's advice. As a result, the focus of the state appellate court's decision was limited to whether petitioner demonstrated that, but for his counsel's advice, the result of the proceeding would have been different. The state court concluded that the result of the proceeding would not have been different. To the extent that petitioner addresses this prong of the *Strickland* test at all, he argues that the disparity in sentence length provides sufficient proof that he would have chosen the plea deal.

As the state court found, petitioner simply has not provided any evidence that the prosecution ever formally offered a plea bargain providing for a flat fifteen-year sentence. The evidence in the record, including the statements of petitioner's trial counsel and the prosecutor, indicates that discussions were undertaken but do not demonstrate the existence of any specific plea arrangement. Instead, petitioner relies on speculation and conjecture relating to a fifteen-year sentence rather than providing evidence of any plea bargaining process. For example, in his petition, petitioner argues

14

that "the record shows that trial counsel believed that he could have secured a plea deal that would have resulted in a prison term of fifteen years."  Petition for Writ of Habeas Corpus (#2), p. 14.  A belief held by petitioner's trial counsel that he may have been able to secure a plea bargain simply is not evidence of either the plea bargaining process or that a plea deal was offered.

Additionally, the disparity in potential sentence length standing alone does not allow petitioner to meet his burden here.  While the Sixth Circuit "has given special weight to significant disparities between penalties offered in a plea and penalties of a potential sentence in determining whether a defendant suffered prejudice by not accepting a plea offer," *U.S. v. Morris*, 470 F.3d 596, 602 (6th Cir. 2006) quoting *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003), this is not the situation presented by petitioner.  Again, petitioner has not demonstrated that any specific fifteen-year plea deal was offered such that any actual or significant disparity existed.

 In short, as respondent argues, petitioner cannot demonstrate that he was prejudiced by failing to accept a plea bargain that never was offered.  In light of this, the state appellate court's decision was neither contrary to nor an unreasonable application of clearly established federal law.  Further, the state appellate court decision was not based on an unreasonable determination of the facts in light of the evidence that was presented.  Consequently, petitioner's first claim is without merit.

In reaching this decision, the Court notes that petitioner's ineffective assistance of counsel claim appears to rely only on evidence readily apparent from the face of the

record. In fact, petitioner argues as much in his reply and contends that, as a result, a post-conviction proceeding was not the proper remedy for him to pursue. Nevertheless, even if petitioner were relying on evidence not readily apparent from the face of the record, he did not pursue a timely post conviction petition and the time period for filing such an action has expired. Nothing in the record suggests that petitioner would be able to meet the stringent requirements for consideration of his claim in a delayed post-conviction petition. *See* R.C. §2953.23.[1]

**CLAIM TWO**

In the petition, petitioner's second claim is that he was deprived of his right to present a full defense because the trial court denied a self-defense instruction. In responding to this argument, the respondent addressed the issue of the omission of jury

---

1. O.R.C. §2953.23 provides in pertinent part:

(A) ... [A] court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless both of the following apply:

(1) Either of the following applies:
(a) The petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.

(b) Subsequent to the period prescribed in or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(2) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

instructions on self-defense and but also addressed the issue of the omission of jury

instructions on voluntary manslaughter.  Both of these issues had been raised by the

petitioner on direct appeal.  As a result, in his reply, petitioner addresses the issue of his

request for an instruction on voluntary manslaughter.   Because respondent has

addressed the issue of the trial court's failure to instruct on voluntary manslaughter, no

prejudice will result from this Court's consideration of this issue within petitioner's

second claim.  *See, e.g., Stallings v. Bagley*, 561 F.Supp.2d 821, 860 n. 14 (N.D. Ohio 2008).

Consequently, the Court will consider both issues relating to jury instructions.

> The trial  court addressed these issues as follows:

> The defendant has requested jury instructions on the affirmative defense
> of self-defense and on the inferior offense of voluntary manslaughter.
> Self-defense is an affirmative defense, and the defendant bears both the
> burden of going forward with the evidence of self-defense and the burden
> of proving the same.  He must establish such a defense by a
> preponderance of the evidence.  The Court is not obligated to instruct on
> self defense."[i]f the evidence adduced at trial is legally insufficient to
> raise the issue of self-defense."  *State v. Barnd* (1993), 85 Ohio App.3d 254,
> 259.

> In the case at bar, to receive an instruction on self-defense, the defendant
> must show there is legally sufficient evidence raising an issue as to both of
> the following: (1) That he was not at fault in creating the situation giving
> rise to the event in which the death of Jodi Blankenship occurred; and (2)
> That he had reasonable grounds to believe and an honest belief, even if
> mistaken, that he was in imminent danger of death or great bodily harm.
> These elements are cumulative, and the defendant's failure to show
> legally sufficient evidence raising an issue on either element warrants the
> refusal of a self defense instruction.  See *State v. Jackson* (1986), 22 Ohio
> St.3d 281.  Moreover, "[i]f force used is so greatly disproportionate to [the
> defendant's] apparent danger to show an unreasonable purpose to injure
> the victim, then the defense of self-defense is not available."  *State v.*
> *Hunter*, Cuyahoga App. No. 86048. 2006-Ohio-20 (one wound to

defendant caused by the victim as opposed to twenty-two knife wounds inflicted by the defendant on the victim, demonstrated excessive force), quoting *State v. Jackson*, supra.

In the case at  bar there is legally insufficient evidence showing that the defendant was not at fault in creating the encounter that led to Jodi Blankenship's death.  The undisputed evidence shows that defendant and Blankenship argued over Blankenship's new boyfriend.  Blankenship attempted to withdraw from the argument by entering the bathroom and locking the door.  Rather than leaving Blankenship alone, the defendant rattled the door, cut the electrical power [to] the bathroom, then waited outside the door for at least an hour for Blankenship to emerge.  When she finally opened the door, the defendant confronted her in the doorway. Defendant has failed to show there is legally sufficient evidence on the "lack of fault" element of self defense.

Furthermore, there is no evidence supporting any reasonable conclusion that the defendant's use of force was anything other than greatly disproportionate to his apparent anger.  Defendant received two minor wounds, and returned these with fourteen severe stab wound to vital parts of the victim's body, six of which were imminently fatal.

Accordingly, the defendant has not shown there is sufficient evidence justifying an instruction on self defense, and his request for the same is denied.

An instruction on the inferior degree offense of voluntary manslaughter is appropriate only if there is legally sufficient evidence that the defendant was under a sudden fit of passion or rage.  Fear for one's safety does not constitute sudden passion or fit of rage within the meaning of the voluntary manslaughter statute.  *State v. Harris* (1998), 129 Ohio App.3d 527.  In the case at bar, the defendant produced evidence that he feared for his life and struggled with the victim.  He could not remember actually stabbing her.  His fear for his safety, alone, does not justify an instruction on voluntary manslaughter, and the defendant has not produced legally sufficient evidence that he was under the influence of a sudden passion or fit of rage.

Accordingly, the defendant's request for an instruction on voluntary manslaughter is denied.

18

*Exhibit 3 to Return of Writ*.

The Fourth District Court of Appeals affirmed the trial court decision, stating as follows:

{22} We have previously set out our standard of review regarding a trial court's jury instructions:

> The law requires a trial court to give the jury all instructions that are relevant and necessary for the jury to properly weigh the evidence and reach their verdict as the fact finder. *State v. Comen* (1990), 50 Ohio St.3d 206, 443 N.E.2d 640, paragraph two of the syllabus. The jury instructions 'must be based upon the actual issues in the case as presented by the evidence.' *State v. Tompkins* (Oct. 25, 1996), Clark App. No. 95-CA-0099, 1996 WL 612855, citing *State v. Scimemi* (June 2, 1995), Clark App. No. 94-CA-58, 1995 WL 329031. Where it is possible that 'reasonable minds might reach the conclusion sought by the specific instruction' the court must provide guidance to the jury. See Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585, 575 N.E.2d 828. While the actual wording of the charge is left to the court's discretion, the need for an instruction presents a question of law. Id.

*State v. Dyer*, Scioto App. No. 07CA3163, 2008-Ohio-2711, at ¶ 11, quoting *State v. Monroe*, Scioto App. No. 05CA3042, 2007-Ohio-1492, at ¶ 50; see, also, *State v. Babu*, Athens App. No. 07CA36, 2008-Ohio-5298, ¶ 21.

B. Instructions on Self-Defense

{¶ 23} Under Ohio law self-defense is an affirmative defense, which a defendant must prove by a preponderance of the evidence. R.C. 2901.05(A); *State v. Martin* (1986), 21 Ohio St.3d 91, 488 N.E.2d 166, syllabus. In order to establish self-defense, a defendant has to prove that (1) he was not at fault in creating the situation giving rise to the affray, (2) he had reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm and that his only means of escape from such danger was by the use of force, and (3) he had not violated any duty to escape to avoid the danger. *State v. Williford* (1990), 49 Ohio St.3d 247, 249, 551 N.E.2d 1279; *State v. Robbins* (1979), 58 Ohio St.2d

19

74, 388 N.E.2d 755, paragraph two of the syllabus. A defendant is privileged to use only that force that is reasonably necessary to repel the attack. *Wiiliford* at 249, citing *State v. McLeod* (1948), 82 Ohio App. 155, 157, 80 N.E.2d 699. The elements of self-defense are cumulative, and if defendant fails to prove any one of the elements by a preponderance of the evidence, he fails to demonstrate that he acted in self-defense. See *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 72, citing *State v. Jackson* (1986), 22 Ohio St.3d 281, 284, 490 N.E.2d 893.

{¶ 24} A defendant must meet the burden of going forward with evidence of a nature and quality sufficient to raise an affirmative defense. *State v. Howard*, Ross App. No. 07CA2948, 2007-Ohio-6331, ¶ 28, citing R.C. 2901.05; *State v. Cross* (1979), 58 Ohio St.2d 482, fn. 5, 391 N.E.2d 319; *State v. Abner* (1978), 55 Ohio St.2d 251, 379 N.E.2d 228. The trial court, as a matter of law, cannot give a jury instruction on an affirmative defense if a defendant fails to meet this burden. *Id.*, citing *Cross* at fn. 5; *Abner* at 253-254, 379 N.E.2d 228; *State v. Melchior* (1978), 56 Ohio St.2d 15, 20, 381 N.E.2d 195. "The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue." *Melchior* at paragraph one of the syllabus. A trial court does not err by refusing to instruct on self-defense when the defendant fails to produce sufficient evidence to support that defense. *Howard* at ¶ 29, citing *State v. Nichols*, Scioto App. No. 01 CA2775, 2002-Ohio-415.

{¶ 25} In denying Hendrickson's request for a jury instruction on self-defense, the trial court stated:

In the case at bar, there is legally insufficient evidence showing that the defendant was not at fault in creating the encounter that led to Jodi Blankenship's death. The undisputed evidence shows that defendant and Blankenship argued over Blankenship's new boyfriend. Blankenship attempted to withdraw from the argument by entering the bathroom and locking the door. Rather than leaving Blankenship alone, the defendant rattled the door, cut the electrical power [sic] the bathroom, then waited outside the door for at least an hour for Blankenship to emerge. When she finally opened the door, the defendant confronted her in the doorway. Defendant has failed to show there is legally sufficient evidence on the "lack of fault" element of self defense.

20

Furthermore, there is no evidence supporting any reasonable conclusion that the defendant's use of force was anything other than greatly disproportionate to his apparent danger. Defendant received two minor wounds, and returned these with fourteen severe stab wounds to vital parts of the victim's body, six of which were imminently fatal. Accordingly, the defendant has not shown there is sufficient evidence justifying an instruction on self defense, and his request for the same is denied.

{¶ 26} Hendrickson contends that he presented sufficient evidence to show that he was not "at fault" in creating the encounter that led to Blankenship's death. Hendrickson argues that while his actions may have created the situation leading up to the affray, he did not provoke the violence that resulted. In support of his position, he relies on *State v. Gillispie*, 172 Ohio App.3d 304, 2007-Ohio-3439, 874 N.E.2d 870, where the court stated:

 The first prong of the *Robbins* test for self-defense-that the defendant was not at fault in creating the situation giving rise to the affray-does not require a showing that the defendant played no part in it. Neither does it preclude the defense if the defendant was engaged in criminal conduct when he was attacked. *State v. Turner*, 171 Ohio App.3d 82, 869 N.E.2d 708. Rather, it requires a defendant to show that he was not "at fault" in creating the situation; that is, that he had not engaged in such wrongful conduct toward his assailant that the assailant was provoked to attack the defendant.

*Gillispie* at ¶ 17.

{¶ 27} Hendrickson argues that because the evidence showed that Blankenship started the "actual physicality of the assault" by stabbing him, the trial court erred when it focused on events leading up to the physical exchange. If the evidence shows that the defendant threatened the victim or was the aggressor, he will normally be unable to establish that he was not "at fault" in creating the situation which gave rise to his use of force. See *Melchior, supra*, at 20, 381 N.E.2d 195; see, also, *Robbins*, *supra*, at 80, 388 N.E.2d 755. Thus, the "not-at-fault" requirement generally means that the defendant must not have been the initial aggressor in the incident. See *Robbins*. And, as we have previously concluded, the concept of not being "at fault" is broader than simply not being the immediate aggressor. See *Nichols, supra*, at *4. In Nichols we found that trial court

21

properly rejected an instruction on self-defense where the evidence showed that the defendant was "at fault" for creating the affray even though the victim threw the first punch. We noted that a person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense. *Id*. Our holding in Nichols is consistent with the *Gillispie* decision where a defendant is "at fault" if he engaged in "such wrongful conduct" as to provoke the violent situation. See *Gillispie* at ¶ 17.

{¶ 28} Thus, the aggressor in an encounter normally may not avail himself of the protection of self-defense. *Williford, supra*, at 249, 551 N.E.2d 1279. However, while Hendrickson was verbally aggressive with Blankenship and created an environment ripe for physical confrontation, there is no evidence in the record that he threatened Blankenship with deadly force and/or physically assaulted her. Yet, Blankenship responded to Hendrickson's non-deadly "aggression" by using deadly force, i.e. by stabbing him twice in the abdomen with a knife. In other words, Blankenship did not simply respond to Hendrickson's provocation with the use of physical force, which may have been justified. Rather, she used deadly force in response to a situation that did not justify it. Because Blankenship's use of deadly force against Hendrickson was not lawful, Hendrickson was justified in defending himself against a deadly attack. In other words, a "non-deadly aggressor" who begins an encounter may justifiably defend himself against a deadly attack. He may do so because the use of deadly force by the victim in response to non-deadly aggression is an unlawful use of force. See 2 *LaFave, Substantive Criminal Law* (2 Ed.2003) 153-154, Section 10.4(e). For instance, if the initial aggressor slaps the victim with an open hand, should the law preclude that aggressor from defending himself if the victim pulls a gun and starts shooting? To adopt such a policy would be to encourage victims to overreact with deadly force rather than restricting the victims to only the degree of force necessary to repel the initial attack. Thus, we conclude that the trial court erred in finding that Hendrickson failed to show that he was not "at fault" in creating the situation giving rise to Blankenship's death.

{¶ 29} Nevertheless, Hendrickson was not entitled to an instruction of self-defense because no reasonable juror could believe that the degree of force he used, i.e. stabbing Blankenship 14 times, was "reasonably necessary" to repel the attack. As an alternative basis for denying his request, the trial court found that all the evidence showed his use of force was greatly disproportionate to his apparent danger. Hendrickson contends that the trial court erred when it cited his use of excessive force

as a basis for denying the instruction. He argues that whether he used a disproportionate amount of force was a fact issue for the jury and not an appropriate consideration concerning whether he was legally entitled to the instruction.

{¶ 30} Under a self-defense claim, a person is privileged to use only that force that is reasonably necessary to repel the attack. See *Williford*, *supra*, at 249, 551 N.E.2d 1279. The second element of the affirmative defense of self-defense requires the defendant to prove that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of such force. See *State v. Thomas* (1997), 77 Ohio St.3d 323, 330, 673 N.E.2d 1339, citing *Williford* at 249, 551 N.E.2d 1279, and *Robbins* at paragraph two of the syllabus. This second element has both objective and subjective components. The defendant's belief must be objectively reasonable under the circumstances, and the defendant must have subjectively and honestly believed that danger was imminent. *State v. Keith*, Franklin App. Nos. 08AP-28, 08AP-29, 2008-Ohio6122, ¶ 23, citing Thomas at 330-331, 673 N.E.2d 1339. The objective part of the test requires consideration of "whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack," a reasonable person would believe that danger was imminent. *Id.*, citing *Thomas* at 330, 673 N.E.2d 1339. The subjective part requires consideration of whether the defendant himself actually believed that he was in imminent danger. *Id.*

{¶ 31} Implicit in this second element of self-defense, i.e. that the defendant's use of deadly force was in "good faith," is the requirement that the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived threat. See *State v. Palmer* (1997), 80 Ohio St.3d 543, 564, 687 N.E.2d 685; see, also, *Cassano*, *supra*. In *Cassano*, the Supreme Court of Ohio found that the trial court's erroneous instruction on the "duty to retreat" element of self-defense was harmless because the defendant had no basis for a "bona fide belief that he was in imminent danger of death or great bodily harm" and could "escape from such danger" only by using deadly force. *Id.* at ¶ 74-76, 772 N.E.2d 81. The Court noted that even under the defendant's version, when he stabbed the victim, the victim had no weapon and that once the defendant retrieved the "shank" from the victim, he was not in danger. The Court also found that the defendant repeatedly stabbed the victim after the victim ceased to pose any conceivable threat to him. *Id.* at ¶ 77, 772 N.E.2d 81. Thus, the

23

Court found that the defendant was not prejudiced by the trial judge's erroneous instruction on the duty to retreat because no reasonable jury could have believed that he acted in self-defense. *Id.*, citing Palmer, supra, at 564, 687 N.E.2d 685. In *Palmer*, the Supreme Court of Ohio found that the trial court properly refused to instruct the jury on self-defense in part because no reasonable jury could have believed that the defendant used deadly force in "good faith." *Id.* The Court found that even if the defendant was justified in attempting to strike the victim with his fist and that the gun defendant was carrying accidently discharged, defendant's act of firing a second shot into the victim's head and his act of firing two shots into the second's victim's head "were certainly not warranted." *Id.*

{¶ 32} In *State v. Rice*, Butler App. No. CA2003-01-015, 2004-Ohio-697, the Twelfth District Court of Appeals considered whether the trial court erred in failing to instruct the jury on self-defense as requested. There, the evidence showed that the victim was stabbed in the chest five times. According to the defendant, he was arguing with the victim in her vehicle when she hit him with her fists. He hit her back so she pulled out a knife, waved it in his face, and attempted to stab him. He grabbed her hand and pushed it down to keep the knife away from him. Defendant maintained that the knife "could have possibly cut her at that time." *Id.* at ¶ 27. In concluding that the trial court did not err in refusing to instruct the jury on self-defense, the Twelfth District held that a defendant is privileged to use only the level of force that is reasonably necessary to repel the attack. *Id.* at ¶ 28. Even assuming the defendant's version, however, the court found that he had not demonstrated that the force reasonably necessary to repel the victim's attack required stabbing her five times in the chest. Thus, the court found that defendant had failed to demonstrate that he acted in self-defense and that the trial court did not err in failing to instruct the jury on self-defense. *Id.* at ¶ 29.

{¶ 33} We have specifically held that self-defense is inappropriate if the force used is "so grossly disproportionate as to show revenge or as criminal purpose." *Nichols*, supra, at *3 (concluding that trial court properly refused to instruct the jury on self-defense where the evidence showed in part that defendant inflicted severe harm on the victim, that "exceeded that which was conceivably necessary to 'repel' the attack"), citing *State v. Speakman* (Mar. 27, 2001), Pickaway App. No. 00CA35, 2001 WL 315198, unreported; see, also, Ohio Jury Instructions, CR 421.23 ("Excessive Force. If the defendant used more force than reasonably necessary and if the force used is greatly disproportionate to the apparent

24

danger, then the defense of [self-defense] is not available.").

{¶ 34} According to Hendrickson, after Blankenship stabbed him, he started "pushing." He believed he may have gotten a hold of the knife, but was not sure. As he continued to "push," she "tried to resist me" and then said, "oh my gosh Ron." He stopped "pushing," but she then came toward him and pushed him backward. The next thing he remembered was pushing and pulling, from side to side, and back and forth. While he admitted to several responding officers at the scene that he "stabbed" Blankenship, Hendrickson testified that he did not actually remember stabbing her.

{¶ 35} Although Hendrickson may not remember stabbing Blankenship, the evidence shows that she in fact suffered from 14 stab wounds, six of which were fatal. Several of the stab wounds were to vitals areas of the body. As described above, her neck was slashed and her right thyroid artery and right thyroid cartilage were sliced in two. She also suffered from a fractured cervical vertebrae. She also sustained stab wounds to her heart, lungs, abdomen, hips, and shoulder and stab wounds to her arms and hands, which were described as "defensive wounds." According to Hendrickson, he suffered from two small stab wounds on his left side; he did not receive stitches for his injuries. Other than the initial pain in his left side from being stabbed, Hendrickson's testimony showed that he suffered from no other injuries during the "struggle." And there was no other evidence of any defensive wounds on his hands or arms.

{¶ 36} Moreover, as for the "struggle" that ensued after Blankenship inflicted the two minor stab wounds, Hendrickson testified that during this time Blankenship tried to "resist" him, which suggests defensive action on her part. Then, after believing that he "may" have gotten a hold of the knife, there was only one specific instance in which he described that she came at him and "pushed" him backward, stating "oh my gosh Ron." Other than that instance where she merely "pushed" him, there was no other testimony concerning the "threat" she actually posed as he continued "pushing and pulling." Thus, it is clear that at some point during the "struggle," Blankenship no longer posed a conceivable threat to him and his actions were no longer "defensive." See *State v. Broe*, Hamilton App. No. C-020521, 2003-Ohio-3054, ¶ 75 (finding that the trial court's erroneous instruction on the "duty to retreat" element was harmless error because while one blow to the victim's head may have constituted self-defense, the next several blows defendant rendered to her

25

head while she was attempting to rise "removed [defendant's] action from being defensive."). See, also, *Cassano*, supra, at ¶ 77.

{¶ 37} We are quick to acknowledge that the law does not require one who is exercising self-defense in response to a deadly threat to measure his efforts with the eye of a surgeon. The exigency of that situation does not require analytical precision. To paraphrase Justice Holmes in *Brown v. United States* (1921), 256 U.S. 335, 65 L.Ed.2d 961, detached reflection in the presence of deadly force is an unreasonable demand. However, we do not impose such an unreasonable standard here. Given the severity of Blankenship's numerous stab wounds, their location, and the multiple defensive wounds, along with Hendrickson's two minor stab wounds and vague description of the "struggle" and the threat Blankenship posed, we agree with the trial court's finding that Hendrickson's force was grossly disproportionate to the perceived danger. Because no reasonable jury could believe that stabbing Blankenship 14 times after disarming her was "reasonably necessary" to repel her attack, the trial court did not err in refusing to instruct the jury on self-defense. In other words, arguably Hendrickson may have been justified in using deadly force until he was safe from Blankenship's efforts to stab him. Once he eliminated her threat to his life or serious bodily injury, he had to stop using deadly force. He did not. Therefore, his use of force was excessive. Hendrickson's continued use of deadly force did not indicate he exercised it in good faith. His use of force was so grossly disproportionate to the actual threat Blankenship represented after she had been disarmed that it indicates he acted out of revenge or criminal purpose rather than self-defense.

{¶ 38} Therefore, we conclude that Hendrickson was not entitled to an instruction on self-defense. Accordingly, we overrule Hendrickson's first assignment of error.

### C.  Voluntary Manslaughter

{¶ 39} R.C. 2903.03(A) defines "voluntary manslaughter" and provides: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." Voluntary manslaughter is an inferior-degree offense to aggravated murder. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 80.

{¶ 40} Before a trial court gives a voluntary manslaughter instruction in a murder case, the court first must determine "whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *Id.* at ¶ 81, 857 N.E.2d 547, citing *State v. Shane* (1992), 63 Ohio St.3d 630, 590 N.E.2d 272, paragraph one of the syllabus. "In making that determination, trial courts must apply an objective standard: 'For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id.*, quoting *Shane* at 635, 590 N.E.2d 272. "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." *Shane* at 634, 590 N.E.2d 272.

{¶ 41} "Once the court finds that the evidence shows that the defendant was sufficiently provoked under the objective standard, the inquiry shifts to a subjective standard: whether the defendant actually was under the influence of sudden passion or in a sudden fit of rage." *State v. Sudderth*, Lawrence App. No. 07CA38, 2008-Ohio-5115, ¶ 14, citing *Shane, supra*. It is at this point that the defendant's emotional and mental state and the conditions and circumstances that surrounded him at that time must be considered. *Shane* at 634, 590 N.E.2d 272. However, "[e]vidence supporting the privilege of self-defense, i.e. that the defendant feared for his own and other's personal safety, does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute." *Sudderth* at ¶ 14, quoting *State v. Harris* (1998), 129 Ohio App.3d 527, 535, 718 N.E.2d 488; *see, also State v. Perdue*, 153 Ohio App.3d 213, 2003-Ohio-3481, 792 N.E.2d 747, at ¶ 12. "While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of 'anger, hatred, jealously, and/or furious resentment.' " Id. at ¶ 14, 792 N.E.2d 747, quoting *State v. Levett*, Hamilton App. No. C-040537, 2006-Ohio-2222, at ¶ 29 (citations omitted). "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *Perdue* at ¶ 12, citing *State v. Mack* (1998), 82 Ohio St.3d 198, 201, 694 N.E.2d 1328.

{¶ 42} In denying Hendrickson's request for a voluntary manslaughter instruction, the trial court stated:

In the case at bar, the defendant produced evidence that he feared for his life and struggled with the victim. He could not remember actually

27

stabbing her. His fear for his safety, alone, does not justify an instruction on voluntary manslaughter, and the defendant has not produced legally sufficient evidence that he was under the influence of a sudden passion or fit or rage.

Accordingly, the defendant's request for an instruction on voluntary manslaughter is denied.

{¶ 43} Hendrickson argues that there was ample evidence from which the jury could have reasonably found that he acted under "sudden passion" or a "sudden fit of rage" brought on by Blankenship's "serious provocation." He argues that after Blankenship unexpectedly stabbed him, he acted out of fear and "in passion" and points to their "mutual-combat" struggle and the ferocity of the attack.

{¶ 44} However, even if we assume that the evidence supports an objective finding that Hendrickson was sufficiently provoked by Blankenship, we conclude that the evidence fails to show that Hendrickson actually acted under a sudden passion or fit of rage sufficient to warrant a voluntary manslaughter instruction. First, Hendrickson's act of killing Blankenship by stabbing her 14 times demonstrates a purposeful killing, not an impulsive one. *See State v. Carter* (2000), 89 Ohio St.3d 593, 602, 734 N.E.2d 345. In *Carter*, the Supreme Court of Ohio found that the trial court did not err in refusing to instruct the jury on voluntary manslaughter as the defendant requested. The Court concluded that the defendant's request was properly denied because the evidence, including that the victim was stabbed 18 times, fully supported a purposeful killing. *Id.* at 602, 734 N.E.2d 345; *see, also, State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 70 (voluntary-manslaughter instruction was not warranted where defendant's act of killing the victims by shooting one victim five times and shooting the other victim in the back of the head demonstrates purposeful killing).

{¶ 45} Second, the record clearly demonstrates Hendrickson's subjective belief that he acted out of fear and not sudden passion or rage. According to Hendrickson, he was "shocked" when Blankenship stabbed him and he immediately began pushing her away. He was "very scared" and thought he was going to die. He twice yelled "what's the knife for" in an effort to get help. When asked about his mental state, Hendrickson testified, "I was fearful, very fearful for my life. And I was just panicking, I guess, and in

passion." At some point he believed he may have gotten a hold of the knife and stopped pushing. However, when she came back toward him and pushed him backward, he was "panicking" and thought he was a "dead man." The next thing he remembered was pushing and pulling, "trying to stop me from getting stabbed and stuff." When asked why he fought with Blankenship, Hendrickson stated, "To save myself. I didn't want to die. To stop myself from getting stabbed."

{¶ 46} Clearly, the crux of Hendrickson's testimony was that acted out of fear, not passion or rage. He consistently testified that he was "fearful" for his life and "scared" he might die; he "panicked" and reacted to protect himself. Moreover, Hendrickson never testified that he acted under a sudden fit of rage. Hendrickson argues that their violent struggle supports a finding of rage. However, we find that his vague description of a "struggle" consisting of "pushing and pulling" where he does not even remember stabbing Blankenship 14 times does not satisfy his burden to produce evidence showing that he in fact stabbed her with emotions of "anger, hatred, jealously, and/or furious resentment in rage," especially where his testimony makes no mention of such emotions. Likewise, Hendrickson did not satisfy his burden to produce evidence showing that he acted under a sudden passion. Other than one fleeting reference to "I guess, and in passion" there is no other evidence that Hendrickson actually stabbed her under a sudden passion sufficient to warrant a voluntary manslaughter instruction. Because Hendrickson failed to present evidence to show that he actually acted under a sudden passion or fit of rage, the trial court was correct in refusing to instruct on voluntary manslaughter. Thus, we overrule Hendrickson's second assignment of error.

Petitioner claims that because he testified that he acted to defend himself, the jury should have been instructed on the affirmative defense of self-defense. According to petitioner, the trial court's failure to instruct on self-defense prevented the jury from considering whether petitioner used only that force which was reasonably necessary to repel the attack in light of the perceived threat. Petitioner claims that the following facts are relevant to this determination.

29

> It was completely dark in the hallway in which they were standing. [Petitioner's] emotions were already running extremely high due to the current situation. He was enraged and unable to think clearly, when out of no where he felt a knife thrust into his side. He was stabbed more than once, and thus, with his multiple wounds, it is possible that a reasonable juror could find that he acted in self defense. His perception of the situation was one where his life was under siege. He felt as though he needed to react the way he did as a result of his clouded thought process in order to save his own life.

*Petition for Writ of Habeas Corpus*, pp. 17-18.

In his reply, petitioner argues further that the instruction was required because: (1) he was stabbed first, (2) the weapon belonged to the victim, and (3) he did not use the weapon until after being stabbed by the victim. Contrary to petitioner's assertions, the respondent contends that the force used by petitioner in response to the victim's actions - fourteen stab wounds, six of which were fatal - was "unreasonable and grossly disproportionate to the force used by his victim." Respondent's Answer/Return of Writ (#8), p. 19. As a result respondent asserts, petitioner was not entitled to have the jury instructed on self-defense.

With respect to the issue of a trial court's failure to instruct on self-defense, the Sixth Circuit has held:

> the right of a defendant in a criminal trial to assert self-defense is one of those fundamental rights, and that failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause. It is indisputably federal law as announced by the Supreme Court that a defendant in a criminal trial has the right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *see also Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Harrington v. Jackson*, 1 Fed.Appx. 367, 2001

30

U.S.App. LEXIS 532 (6th Cir. January 10, 2001). A necessary corollary of this holding is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions.

*Taylor v. Withrow*, 288 F.3d 846, 851-852 (6th Cir. 2002).

Under Ohio law, a defendant must establish three elements to prove self-defense: (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of force; and (3) that he must not have violated any duty to retreat or avoid the danger. *Horton v. Warden, Trumbull County Correctional Inst.*, 767 F.Supp.2d 833, 838 (N.D. Ohio 2011) citing *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195, 199 (1978); *see also State v. Williford*, 49 Ohio St.3d 247 (1990); *State v. Robbins*, 58 Ohio St.2d 74 (1979). "[A] defendant is privileged to use that force which is reasonably necessary to repel the attack." *Rice v. Moore*, 633 F.Supp.2d 541, 558 (S.D. Ohio 2008) citing *State v. McLeod*, 82 Ohio App. 155, 157 (1948). However, "if the defendant 'fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense.'" *Id*. quoting *State v. Jackson* , 22 Ohio St.3d 281, 284 (1986).

Further, "[a] trial court does not err in failing to instruct the jury on self-defense where the evidence is insufficient to support the instruction." *Rice*, 633 F.Supp.2d at 558 citing *State v. Palmer*, 80 Ohio St.3d 543 (1997). A reviewing court, in determining whether a defendant has introduced sufficient evidence to successfully raise self-

31

defense, must evaluate the evidence, "'which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.'" *State v. Palmer*, 80 Ohio St.3d at 564; *see also* Rice, 633 F.Supp.2d at 558; *Melchior, supra*.  The Court is satisfied that the evidence presented at trial was insufficient to support a self-defense instruction.

In considering the elements of self-defense under Ohio law, the state trial court focused primarily on the "lack of fault" element and concluded that petitioner had failed to demonstrate that he was not at fault in creating the situation that led to the victim's death.  Alternatively, the trial court noted that there was no evidence in the record supporting a reasonable conclusion "that petitioner's use of force was anything other than greatly disproportionate to his apparent danger."  *Exhibit 3 to Return of Writ*, p. 3.  The state appellate court rejected the trial court's conclusion on the lack of fault element but upheld the trial court's conclusion that petitioner's use of force was greatly disproportionate to his apparent danger.  In doing so, the appellate court considered petitioner's argument that the question of his use of a disproportionate amount of force was a fact issue for the jury.  The appellate court discussed at great length the subjective and objective components of this issue and noted that this second element of self-defense required a "good faith" use of deadly force "warranted" under the circumstances and "proportionate" to the threat.  As the Ohio Court of Appeals explained in significant detail, petitioner failed to provide any evidence demonstrating that the force reasonably necessary to repel his victim's attack after he took the knife

away from her required him to inflict fourteen stab wounds, six of which were fatal. Absent any evidence of this nature, the record provides no basis upon which the Court could conclude that petitioner was entitled to a self-defense instruction.   Under this circumstance, the trial court's failure to give an instruction on self-defense was not contrary to controlling federal authority nor based on an unreasonable determination of the facts in light of the evidence that was presented.

With respect to the issue of voluntary manslaughter, petitioner argues that because he presented facts indicating that he "acted in a fit of rage," the trial court erred by not instructing on this issue.   Reply (#9), p. 9.  Respondent argues that petitioner provided no evidence to support an instruction on voluntary manslaughter.  Rather, respondent contends that all of the evidence presented demonstrates a purposeful killing for which  petitioner sought to avoid responsibility by using the term "passion" in his testimony.

To the extent petitioner may be claiming that he is entitled to relief because the trial court committed error or abused its discretion under state law by declining to issue a jury instruction on the inferior offense of voluntary manslaughter, he raises issues of state law only. Matters pertaining to state law, however, are not cognizable in federal habeas corpus review. A federal court may review a state prisoner's habeas corpus petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41, (1984); *see also Smith v. Sowders*,

848 F.2d 735, 738 (6th Cir.1988); *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir.1988).

Moreover, errors related to jury instructions are generally not cognizable in federal habeas corpus unless such errors deprive the petitioner of a fundamentally fair trial. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir.1986); *Thomas v. Arn*, 704 F.2d 865, 868-69 (6th Cir.1983). An omission or an incomplete instruction is less likely to be prejudicial than a misstatement of law. *Henderson*, 431 U.S. at 155.

To the extent that any constitutional issues are implicated by the petitioner's assertion that the trial court's failure to instruct on voluntary manslaughter rendered his trial fundamentally unfair, petitioner's claim cannot succeed.  Although voluntary manslaughter is an inferior offense and not a lesser included offense of murder, under Ohio law, "the test for whether a judge should give a jury instruction on voluntary manslaughter when a defendant is charged with aggravated murder is the same test to be applied as when an instruction on a lesser-included offense is sought."  *State v. Shane*, 63 Ohio St.3d 630, 632 (1992).  Accordingly, a defendant charged with aggravated murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of aggravated murder and a conviction of voluntary manslaughter.  *State v. Conway*, 108 Ohio St.3d 214, 238  (2006) citing *Shane*, *supra*.   R.C. 2903.03 defines voluntary manslaughter and states that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage * * * shall knowingly cause the death of another...."  "Before

34

giving a voluntary-manslaughter instruction in a murder case, the trial court must determine 'whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction.' " *Conway,* at 238-239, quoting *Shane*, paragraph one of the syllabus. "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane*, at 635.

Here, petitioner has failed to demonstrate that the omitted jury instruction was so prejudicial that it deprived him of a fundamentally fair trial. The record simply fails to reflect that the state appellate court's decision rejecting petitioner's claim is so unreasonable as to warrant federal habeas corpus relief. 28 U.S.C. §§ 2254(d) & (e); *Williams*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389. Where a state court has reviewed a habeas petitioner's request for a lesser included offense instruction and concludes that it was not warranted by the evidence presented at trial, "that conclusion is axiomatically correct, as a matter of state law." *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir.1990). Here, for the reasons addressed at length by the state appellate court, the evidence failed to reflect that petitioner was acting under a "sudden passion or in a sudden fit of rage" such that he was entitled to a jury instruction on voluntary manslaughter. Consequently, petitioner's second claim also is without merit.

### RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that petitioner's claims be **DISMISSED**.

35

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).


/s/ Terence P. Kemp
United States Magistrate Judge

36